NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0412n.06

No. 20-6084

**UNITED STATES COURTS OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Sep 01, 2021
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| ANNISSA COLSON, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| CITY OF ALCOA, TENNESSEE, et al., | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF TENNESSEE |
| Defendants-Appellants. | ) | |
| | ) | |

BEFORE:     GIBBONS, WHITE, READLER, Circuit Judges.

JULIA SMITH GIBBONS, Circuit Judge.  Defendant Mandy England appeals the district court's denial of her motion for summary judgment in plaintiff Annissa Colson's 42 U.S.C. § 1983 suit against England for deliberate indifference to Colson's serious medical needs.  Colson claims that England, a Blount County Jail correctional officer, refused to provide her with adequate medical care when Colson was brought to the jail with a knee injury.  England argues that the doctrine of qualified immunity protects her from liability for her actions.  On appeal, England argues that Colson was not suffering from an objectively serious medical need, that England did not consciously disregard any medical need, and that Colson's right to medical care was not clearly established.  We affirm the district court's determination that Colson's right to medical attention was clearly established and dismiss the rest of England's appeal for lack of jurisdiction.

I.

On June 23, 2015, Alcoa Police Department officer Dustin Cook arrested Annissa Colson for driving while intoxicated and reckless endangerment after she drove her vehicle off the road. Colson consented to have her blood drawn for a blood alcohol test, so Cook and Alcoa Police officer Arik Wilson transported Colson to a nearby hospital.

When they arrived at the hospital, Colson got out of Cook's police vehicle but refused to enter the hospital to have her blood drawn. Cook told Colson that they would get a search warrant to draw her blood and ordered her to get back in his vehicle. After Colson repeatedly refused to get back in the car, Cook and Wilson attempted to force Colson into the back of the police vehicle. Colson claims that Wilson pushed on her knee and injured it during the struggle. Wilson admitted to Cook at the time that he heard Colson's knee pop when he applied pressure to her leg. Colson eventually got into the back of the police vehicle, and Cook drove her to the Blount County Jail while Colson cried and complained about her injured knee.

Defendant England was one of the Blount County Jail officers who met Cook and Colson when they arrived at the jail. Cook greeted England and told her that Colson was "combative" and that they had used pressure points to get her into the police vehicle. He did not mention the potential injury to Colson's knee. England told Colson to get out of the vehicle and guided her from the garage into a pat-down room inside the jail to perform a preliminary search. Colson was crying but appeared to walk without a limp from the garage to the pat-down room. During her deposition, Colson admitted that she did not have a noticeable limp or problem walking at the time.

When they were in the pat-down room, Colson told England that her "knee is fucked up thanks to your officer." Dash Cam Video 2, 41:52–41:55. England told Colson "ok" and asked her to take a few steps forward and place her forehead against a wall. *Id.* at 41:56. Colson appeared

unsteady on her feet and initially told England that she could not move, though she eventually complied. About ten seconds later, Colson yelled "ow, ow my fucking knee" and fell to the floor. *Id.* at 42:16–42:20. Colson claims that she fell because her knee was unstable, but England claims that she thought Colson's knee buckled because Colson was intoxicated. England and another officer helped Colson off the ground and held her arms to steady her. Colson continued to complain about her knee. Colson removed her jewelry and attempted to step forward to give it to an officer but winced and looked unsteady, so England and another officer held her arms to steady her. A few seconds later, an officer offered Colson a hand to steady her while she removed her shoes, but Colson would not take the arm of any officer and removed her shoes herself.

A few minutes after Colson entered the pat-down room, Jennifer Russell, a nurse at the jail, came to examine Colson's knee. Russell was not in the room when Colson fell to the floor or when she appeared unsteady on her feet. Russell asked what she was checking for, and the officers told her to look at Colson's knee. Colson told Russell that the officers "fucked up [her] knee," that she had "never heard it pop so much" in her life, and that it hurt to move her leg. *Id.* at 46:23– 46:28. Russell bent down to look at Colson's knee and asked her to move it. Colson told Russell that her knee hurt and that she could not straighten it. After examining Colson's knee for less than a minute, Russell said that she "don't see no swelling" and left the room. *Id.* at 47:12–47:18. Colson concedes that there was no swelling when Russell looked at her knee. England claims that she thought Russell's examination of Colson's knee was "quick" but indicates that she trusted Russell's medical judgment to tell the officers if Colson needed further medical attention. DE 139-2, England Dep., Page ID 2088, 2094. Colson did not receive any additional medical treatment while she was at Blount County Jail.

After Russell left, England and several other officers led Colson from the pat-down room and to a jail cell. Based on the body-cam video, at least one officer was holding Colson's arm while she walked to the cell, but it is unclear whether the officer was restraining or supporting her.[1] Off camera, Colson and officers got into a struggle and several officers pinned Colson to the ground. England claims the struggle started because Colson kicked the officers, which Colson denies. The officers then placed Colson in a restraint chair and strapped down her arms and legs so they could draw her blood for the blood alcohol test. While England and other officers were holding Colson down, Colson allegedly bit England's arm.[2] England left the room and returned with a helmet, which she put on Colson until Russell could complete the blood draw. Colson was left in the restraint chair for several hours and then released on bond the next morning. The day after she was released on bond, Colson went to the hospital where she was diagnosed with a fractured tibia, torn anterior cruciate ligament, and a torn lateral collateral ligament.

On June 23, 2016, Colson filed a lawsuit against England, the City of Alcoa, Blount County, and other employees of the City of Alcoa and Blount County who were involved in her arrest. In addition to other claims, Colson alleged that England violated her constitutional rights by failing to provide medical treatment for her knee injury.

England filed her first motion for summary judgment on August 16, 2017. England argued that she was entitled to qualified immunity on Colson's claim of wrongful denial of medical care because Colson did not suffer a serious medical need and England was not deliberately indifferent to Colson's injuries. The district court denied England's motion as to Colson's claim for

---

[1] England claims that Colson walked "without any obvious need of medical assistance." CA6 R. 9, Appellant Br., at 16.

[2] Colson denies biting England.

inadequate medical care.[3] The district court found that Colson "identifie[d] more than enough evidence establishing genuine issues of material fact in the record" as to whether "her knee injury would have been obvious to a layperson." DE 105, Op., Page ID 1494. The district court cited Colson's "repetitious complaints about knee pain, her screams, and her intermittent ability to remain standing—all of which occurred in Officer England's presence." *Id.* The district court described how Colson "fell to the floor while agonizing about her knee" in front of England and "England had to steady Ms. Colson on a separate occasion, when she tottered and winced in the pat down room while stepping forward to put her ring in a bag." *Id.*

The district court concluded that "a reasonable jury could find that Officer England knew of [Colson's need for medical treatment] and disregarded it despite having reasons to believe that the nurse rendered an unreliable medical opinion, if no medical opinion at all." *Id.* at Page ID 1500. First, the district court found that whether Russell issued a medical opinion was "dubious" because Russell's "lone statement was 'I don't see no swelling,' and she left the room without uttering another word to the officers." *Id.* at Page ID 1497. According to the district court, England had reason to know that Russell's opinion was not reliable because she was "privy to the exam and observed Ms. Colson's pained reactions to the movements that the nurse asked her to perform, if not her outright inability to perform them." *Id.* at Page ID 1498. Thus, the district court held that England had failed to show she was entitled to qualified immunity and denied her motion for summary judgment.

---

[3] England claims that she is challenging "the analysis/rulings" of both the district court's opinion denying her first motion for summary judgment and the district court's opinion denying her second motion for summary judgment. CA6 R. 9, Appellant Br., at 23 n.32. England never appealed the district court's first opinion, however, so the only appeal before the court challenges the district court's second opinion and order. But since the district court's second opinion relied heavily on its previous analysis, it is helpful to summarize the district court's first opinion as well.

On November 9, 2018, England filed a second motion for summary judgment. England argued that she was entitled to summary judgment based on the more developed factual record and the present applicable legal standards. The district court disagreed and concluded that it did not "change[] the Court's analysis and conclusions regarding deliberate indifference." DE 202, Op., Page ID 3358–59. England filed a timely notice of appeal.

## II.

"Although '[a]n order denying a motion for summary judgment is generally not a final decision' over which we have jurisdiction, limited review is available if, as here, 'the summary judgment motion is based on a claim of qualified immunity.'" *Downard for Estate of Downard v. Martin*, 968 F.3d 594, 599 (6th Cir. 2020) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 771 (2014)). We may review the district court's denial of qualified immunity "to the extent that it turns on an issue of law." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). For example, "[w]hen faced with an argument that the district court mistakenly identified clearly established law, the court of appeals can simply take, as given, the facts that the district court assumed when it denied summary judgment for that (purely legal) reason." *Johnson v. Jones*, 515 U.S. 304, 319 (1995). Further, "where the trial court's determination that a fact is subject to reasonable dispute is blatantly and demonstrably false, a court of appeals may say so, even on interlocutory review." *Wysong v. City of Heath*, 260 F. App'x 848, 853 (6th Cir. 2008) (quoting *Blaylock v. City of Philadelphia*, 504 F.3d 405, 414 (3d Cir. 2007)).

We may not, however, review the district court's determination that "the summary judgment record . . . raised a genuine issue of fact" or challenge the district court's factual inferences. *Johnson*, 515 U.S. at 313; *see also Scott v. Harris*, 550 U.S. 372, 380 (2007); *Romo v. Largen*, 723 F.3d 670, 675 (6th Cir. 2013) (applying *Johnson* and *Scott* to conclude that we may

not review on interlocutory appeal a district court's factual inferences unless blatantly contradicted by the record). "[I]n the event that legal and factual challenges are confused or entwined, 'we must separate an appealed order's reviewable determination (that a given set of facts violates clearly established law) from its unreviewable determination (that an issue of fact is "genuine").'" *DiLuzio v. Vill. of Yorkville, Ohio*, 796 F.3d 604, 610 (6th Cir. 2015) (quoting *Roberson v. Torres*, 770 F.3d 398, 402 (6th Cir. 2014)).

If the defendant fails to concede the plaintiff's version of the facts on interlocutory appeal, we can "ignore the defendant's attempts to dispute the facts and nonetheless resolve the legal issue" of whether the facts as alleged by the plaintiff support a violation of clearly established law. *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir. 2005); *see also Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 403 (6th Cir. 2007). But "[o]nce a defendant's argument drifts from the purely legal into the factual realm and begins contesting what really happened, our jurisdiction ends and the case should proceed to trial." *Berryman v. Rieger*, 150 F.3d 561, 564–65 (6th Cir. 1998); *see also McKenna v. City of Royal Oak*, 469 F.3d 559, 562 (6th Cir. 2006) (dismissing appeal for lack of jurisdiction because defendants "made no arguments concerning the denial of qualified immunity that [did] not rely on disputed facts"); *Thomas v. Bauman*, 835 F. App'x 5, 8 (6th Cir. 2020) (dismissing appeal for lack of jurisdiction when "defendants premise[d] their legal arguments on 'persuad[ing] us to believe [their] version of the facts'" (second and third alteration in original) (quoting *Berryman*, 150 F.3d at 564)).

### III.

"We review a district court's denial of summary judgment on the grounds of qualified immunity de novo." *Bishop v. Hackel*, 636 F.3d 757, 765 (6th Cir. 2011). Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled

to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The court must view the facts and reasonable factual inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "A genuine issue of material fact exists when there are 'disputes over facts that might affect the outcome of the suit under the governing law.'" *V & M Star Steel v. Centimark Corp.*, 678 F.3d 459, 465 (6th Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Summary judgment is not proper "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

IV.

"The qualified-immunity doctrine shields government officials performing discretionary functions from civil liability unless their conduct violates clearly established rights." *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 680 (6th Cir. 2013). To overcome a defendant's assertion of qualified immunity, a plaintiff must show both (1) that the defendant violated a constitutional right, and (2) that the right was clearly established at the time of the violation. *See Pearson v. Callahan*, 555 U.S. 223, 231–32 (2009). The court may decide these issues in either order. *Id.* at 236.

England challenges the district court's determination that a reasonable jury could find that she acted with deliberate indifference to Colson's serious medical needs. England claims she is entitled to qualified immunity for three reasons. First, she argues that she did not violate Colson's constitutional right because Colson did not objectively suffer from a serious medical need. Second, England claims she did not subjectively know of Colson's need for medical care because she reasonably relied on Russell's medical opinion. Finally, England argues that even if she did violate Colson's constitutional right, the right was not clearly established.

A.

Under the Fourteenth Amendment, pretrial detainees have a "right to adequate medical care." *Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005). A prison official violates that right when she acts with "deliberate indifference" to an inmate's "serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A constitutional claim for denial of medical care has both an objective and subjective component. *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004).[4] Under the objective component, the plaintiff must show a "sufficiently serious" medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Under the subjective component, the plaintiff must show that the defendant "knew of her serious medical need and that, despite this knowledge, the official disregarded or responded unreasonably to that need." *Downard*, 968 F.3d at 600.

1.

The objective component is satisfied if the plaintiff's serious medical need "has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Blackmore*, 390 F.3d at 897 (quoting *Gaudreault v. Mun. of Salem*, 923 F.2d 203, 208 (1st Cir. 1990) (emphasis omitted)). Whether the medical need is so obvious that a layperson would easily recognize it is a question of fact. *See id.* at 899 ("With these facts, a jury could reasonably find that Blackmore had a serious need for medical care that was 'so obvious that even a layperson would easily recognize the necessity for a doctor's attention.'" (quoting *Gaudreault*, 923 F.2d at 208)). However, if the case involves only "minor maladies or non-obvious complaints of a serious need for medical care," then the plaintiff

---

[4] In a footnote, Colson argues that *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), abrogated the need for pretrial detainees to prove the subjective prong of the deliberate indifference test. This court has yet to decide whether *Kingsley*, which dealt with a pretrial detainee's excessive force claim, also applies to claims of deliberate indifference. *See, e.g.*, *Richmond v. Huq*, 885 F.3d 928, 938 n.3 (6th Cir. 2018); *Martin v. Warren Cnty.*, 799 F. App'x 329, 337 n.4 (6th Cir. 2020). Because the issue was not addressed by the district court and was not substantively briefed by the parties, we decline to resolve it here.

must also submit verifying medical evidence to satisfy the objective component. *Estate of Carter*, 408 F.3d at 312 (quoting *Blackmore*, 390 F.3d at 898). Similarly, if the plaintiff's claim is based on an alleged delay in medical treatment, verifying medical evidence is necessary to prove that the failure to promptly treat the plaintiff's injury caused a detrimental effect. *Blackmore*, 390 F.3d at 898–99. Finally, where "an inmate has received on-going treatment for his condition and claims that this treatment was inadequate, the objective component . . . requires a showing of care 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018) (quoting *Miller v. Calhoun Cnty.*, 408 F.3d 803, 819 (6th Cir. 2005)).

England's only legal argument is that Colson did not meet the objective component because she failed to submit verifying medical evidence of a detrimental effect. England misconstrues our case law. There is no requirement that the plaintiff demonstrate a detrimental effect when, as the district court found here, the plaintiff's injury was so obvious that a layperson would recognize the need for medical treatment. *Blackmore*, 390 F.3d at 899–900. When the harm is obvious, the constitutional violation "is not premised upon the 'detrimental effect' of the delay, but rather that the delay alone in providing medical care creates a substantial risk of serious harm." *Id.* at 899. Further, Colson's claim is not that England delayed in providing medical treatment but rather that England failed to provide any adequate medical treatment. This is also not a situation where Colson suffered from an ongoing medical condition and was denied proper treatment. *See, e.g.*, *Rhinehart v. Scutt*, 894 F.3d 721, 741, 747 (6th Cir. 2018) (verifying medical evidence was necessary when alleged violation was inadequate treatment of plaintiff's end-stage liver disease). Because Colson's claim is based on the alleged obviousness of her injury, England's argument that Colson must establish a detrimental effect fails.

England also challenges the evidentiary sufficiency of the district court's conclusion that Colson's injury would have been obvious to a layperson and that Colson suffered a serious medical need. Even though England states that she "is challenging only the *legal determinations* made based on the undisputed material facts in the record and when viewed in the light most favorable to Plaintiff," CA6 R. 16, Reply Br., at 4, England never concedes the facts as alleged by Colson or accepts the district court's factual inferences. For example, England repeatedly says that Colson did not have objective symptoms of a knee injury. The district court, however, identified several facts that support a finding that Colson had objective symptoms of a serious knee injury including "her intermittent ability to remain standing," which required England to steady Colson when she attempted to walk. DE 105, Op., Page ID 1494; *see also* DE 202, Op., Page ID 3358. Further, England repeatedly claims that Colson kicked the officers with her injured knee, which Colson denies. Put another way, England contests what really happened between the parties. Our jurisdiction over this interlocutory appeal does not extend to such factual questions. *Johnson*, 515 U.S. at 313; *Berryman*, 150 F.3d at 564–65; *DiLuzio*, 796 F.3d at 609–10. Accordingly, we do not have jurisdiction to consider this challenge to the objective component of the deliberate indifference test.

2.

Under the subjective component of the deliberate indifference test, the plaintiff must show that the defendant had "a sufficiently culpable state of mind" in denying medical care. *Phillips v. Roane Cnty.*, 534 F.3d 531, 542 (6th Cir. 2008); *see also Farmer*, 511 U.S. at 834–35. "Deliberate indifference 'entails something more than mere negligence,' but can be 'satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *Blackmore*, 390 F.3d at 895–96 (quoting *Farmer*, 511 U.S. at 835). There is no

constitutional violation "[i]f the officers failed to act in the face of an obvious risk of which they should have known but did not." *Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005). To be held liable, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Winkler v. Madison Cnty*, 893 F.3d 877, 891 (6th Cir. 2018) (quoting *Farmer*, 511 U.S. at 837).

"Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842. For example, the factfinder "may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* A non-medically trained official is not deliberately indifferent when he defers to a "medical recommendation that he reasonably believes to be appropriate, even if in retrospect that recommendation was inappropriate." *McGaw v. Sevier Cnty.*, 715 F. App'x 495, 498 (6th Cir. 2017); *see also Winkler*, 893 F.3d at 895 (favorably citing *McGaw*); *Stojcevski v. Macomb Cnty.*, 827 F. App'x 515, 522 (6th Cir. 2020) ("[A]n officer who seeks out the opinion of a doctor is generally entitled to rely on a reasonably specific medical opinion for a reasonable period of time after it is issued, absent circumstances such as the onset of new and alarming symptoms." (quoting *Barberick v. Hilmer*, 727 F. App'x 160, 163–64 (6th Cir. 2018) (per curiam)).

Once again, England contests the basic facts underlying the district court's determination rather than an issue of law. England claims that Colson has not satisfied the subjective component because England did not know that Colson was seriously injured. England repeats her allegations that Colson had no objective symptoms of an injury and "kicked furiously at officers." CA6 R. 9, Appellant Br., at 40. England's description of the events directly contradicts the district court's findings and Colson's account of events. We do not have jurisdiction to decide a question of fact

such as what England knew at the time. *See Kindl v. City of Berkley*, 798 F.3d 391, 398, 400–01 (6th Cir. 2015) ("Defendants' principal arguments regarding qualified immunity reduce merely to a factual contention that Plaintiff cannot prove that they should have known of, much less that they were in fact aware of, Kindl's serious medical need. . . . We are in no better a position than the district court—or more to the point, a jury—to determine whether based on Kindl's statements, convulsions, alleged moans, requests for attention, and appearance, Defendants subjectively understood the gravity of her situation.").

Second, England argues that she cannot be deliberately indifferent because she relied on Russell's adequate medical examination and opinion. England is correct that a prison official may ordinarily rely on a medical professional's opinion, but only when the officer has no reason to believe that the medical professional's opinion was inappropriate or unreliable. *See Winkler*, 893 F.3d at 895. Here, the district court found that there was a factual dispute both as to whether Russell issued a medical opinion at all and, if she did, whether that opinion was appropriate. These evidence sufficiency questions preclude our jurisdiction, which "does not extend to appeals that merely quibble with the district court's reading of the factual record." *Leary v. Livingston Cnty.*, 528 F.3d 438, 441 (6th Cir. 2008); *see also Johnson*, 515 U.S. at 313–14. We have declined to exercise jurisdiction in similar cases. *See Hopper v. Plummer*, 887 F.3d 744, 758 (6th Cir. 2018) (declining to exercise jurisdiction where it was "sharply disputed whether and to what extent" "non-medical prison officials reasonably rel[ied] on or defer[red] to medical staff expertise"); *McKinney v. Lexington-Fayette Urb. Cnty. Gov't*, 651 F. App'x 449, 460 n.6 (6th Cir. 2016) ("The officers' arguments about the medical staff therefore pose questions of fact capable of resolution by competent evidence, including evidence about the officers' observations of facts that indicated that McKinney was in medical distress, the training that the officers received about how to care

for an inmate who was in medical distress, and the officers' perceptions about the adequacy of the treatment that the medical staff provided to McKinney.") Accordingly, we decline to exercise jurisdiction over England's challenge to the district court's conclusions on the subjective component of the deliberate indifference test.

B.

Finally, England argues that even if she did violate Colson's constitutional right, that right was not clearly established based on the particular facts of this case. Despite England's continued refusal to concede the facts in the light most favorable to Colson, we will "ignore the defendant's attempts to dispute the facts and nonetheless resolve the legal issue" of whether the facts support a violation of clearly established law, "obviating the need to dismiss the entire appeal for lack of jurisdiction." *Estate of Carter*, 408 F.3d at 310.

For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right" based on pre-existing law. *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001) (alteration in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The pre-existing law that makes a right clearly established comes primarily from the Supreme Court and the Sixth Circuit, but it can also come from other courts, including other circuits and district courts, if the decisions of those courts "point unmistakably to the unconstitutionality of the conduct." *Perez v. Oakland Cnty.*, 466 F.3d 416, 427 (6th Cir. 2006) (alteration omitted) (quoting *Summar v. Bennett*, 157 F.3d 1054, 1058 (6th Cir. 1998)). The plaintiff has the burden of showing that the right was clearly established. *Id.*

The question of whether law is clearly established should not be considered at a high level of generality. *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). "This is not to say that an official

action is protected by qualified immunity unless the very action in question has previously been held unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002); *see also Perez*, 466 F.3d at 428 ("For a right to be clearly established, 'there need not be a case with the exact same fact pattern, or even "fundamentally similar" or "materially similar" facts.'" (quoting *Cummings v. City of Akron*, 418 F.3d 676, 687 (6th Cir. 2005))); *Sample v. Bailey*, 409 F.3d 689, 699 (6th Cir. 2005) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." (quoting *Hope*, 536 U.S. at 741)). Rather, the proper question is whether the existing precedent gave the defendant fair warning that her conduct was unconstitutional. *Hope*, 536 U.S. at 741; *see also Taylor v. Barkes*, 575 U.S. 822, 825 (2015) (per curiam).

"As early as 1972, this court stated that 'where the circumstances are clearly sufficient to indicate the need of medical attention for injury or illness, the denial of such aid constitutes the deprivation of constitutional due process.'" *Estate of Carter*, 408 F.3d at 313 (quoting *Fitzke v. Shappell*, 468 F.2d 1072, 1076 (6th Cir. 1972)). "Furthermore, in 1992, this court explicitly held that a pretrial detainee's right to medical treatment for a serious medical need has been established since at least 1987." *Id.* (quoting *Heflin v. Stewart Cnty.*, 958 F.2d 709, 717 (6th Cir. 1992)). In *Quigley*, we concluded that "[i]t is clearly established that a prisoner has a right not to have his known, serious medical needs disregarded by his doctors." *Quigley*, 707 F.3d at 684. In 2004, we found that "[w]here the seriousness of a prisoner's needs for medical care is obvious even to a lay person, the constitutional violation may arise." *Blackmore*, 390 F.3d at 899; *see also Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1097 (6th Cir. 1992) (Defendant had "a particularized right— the right to have medical assistance summoned immediately upon the police officers becoming aware that he was in need of immediate medical care.").

England cites several cases that she argues demonstrate that she did not violate a clearly established constitutional right. Each case England cites, however, is distinguishable from this matter when viewing the facts of this case in the light most favorable to Colson. *See Durham v. Nu'Man*, 97 F.3d 862, 869 (6th Cir. 1996) (finding no obvious serious medical need where the plaintiff had no outward signs of serious injury); *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011) (defendants not deliberately indifferent when plaintiff received "extensive treatment" for his injuries); *Loukas v. Gundy*, 70 F. App'x 245, 247 (6th Cir. 2003) (defendant not deliberately indifferent for delaying medical care when plaintiff did not have outward symptoms of injury beyond his complaints of pain); *Brooks v. Jones*, No. 1:14-cv-631, 2014 WL 7212897, at *7 (W.D. Mich. Dec. 17, 2014) (nurse not deliberately indifferent "[e]ven assuming that her evaluation was brief, her diagnosis incorrect, and her treatment ineffective for his condition" because there were "no facts from which to infer that [the nurse] was aware of, and deliberately indifferent to, a serious medical need requiring additional care"). Rather than contest the legal conclusion that a detainee has a right to adequate medical care for obviously serious injuries, England argues that Colson's injury was not obvious or serious. England once again challenges the factual basis of Colson's claim, which we do not have jurisdiction to review.

When viewed in the light most favorable to Colson, a reasonable officer in England's position would have been aware that she was violating Colson's right to adequate medical care. We have consistently held that prison officials violate a detainee's constitutional rights when they ignore a detainee's obvious, serious medical needs. *Estate of Carter*, 408 F.3d at 313. Here, a reasonable juror could conclude that England subjectively knew of and disregarded signs that Colson was at a serious risk of harm including Colson's difficulties standing and moving her knee.

Accordingly, the district court properly held that Colson's right to adequate medical care was clearly established.

V.

We affirm the district court's determination that Colson's right to medical care was clearly established and dismiss the remainder of England's appeal for lack of jurisdiction.

CHAD A. READLER, Circuit Judge, dissenting. Officer Mandy England is entitled to qualified immunity. In this setting, I acknowledge, our interlocutory jurisdiction is limited, particularly as factual findings are "insulated from review." *Downard ex rel. Estate of Downard v. Martin*, 968 F.3d 594, 599 (6th Cir. 2020). As a result, our charge customarily is to "take, as given, the facts that the district court assumed when it denied summary judgment" on legal grounds, yet assess whether, in doing so, the district court "mistakenly identified clearly established law." *Johnson v. Jones*, 515 U.S. 304, 319 (1995); *accord DiLuzio v. Village of Yorkville*, 796 F.3d 604, 611 (6th Cir. 2015) (explaining that the appellate court's "legal determination of whether the defendant violated a clearly established right" can be "based on those now (for this purpose) undisputed record facts" found by the district court (emphasis omitted)). That said, where the version of the facts presented to us is "blatantly contradicted" by video evidence in the record, we "should not adopt that version of facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Here, the salient facts either are not in dispute or are confirmed by a video recording of the events at hand. Following her 2015 arrest for driving under the influence, Annissa Colson was taken to the Blount County jail. England and several other officers escorted Colson into the jail's holding area for a routine pat down. There, Colson complained of severe knee pain from an injury sustained while struggling with her arresting officers. Hearing Colson's complaints, an officer asked aloud for a nurse. Another officer radioed in the request: "Would you send the nurse over here, please?"

Nurse Russell responded and examined Colson for about a minute. Body camera video captured all relevant aspects of the examination. As Colson cursed and struggled, an officer signaled for Russell to begin evaluating Colson's knee injury. Over resistance and abusive

language from Colson, Russell examined Colson's range of motion by directing Colson to straighten her legs, bend her knee back, and then move her knee from side to side. Russell bent down to examine Colson's sore knee, and then her other knee to compare the two, touching each knee. Officers asked Colson to stand still so that Russell could hold Colson's knees together for comparison. Once Colson complied, Russell examined the knees for several more seconds before concluding her examination, colorfully declaring, "I don't see no swelling," a medical conclusion, as the majority opinion acknowledges, Colson does not contest. Russell then left the holding area. Only a subsequent trip to the hospital would reveal Colson's fractured tibia and torn knee ligaments.

Colson alleges that England evinced deliberate indifference to Colson's serious medical needs, conduct that fell below constitutional norms. That may or may not be true. Either way, to overcome England's defense of qualified immunity, Colson must also show that, at the time these events unfolded, our decisions clearly established that England's actions violated the Constitution. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). And that showing, it bears emphasizing, must be "particularized" to the facts of each case. *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam) (citation omitted); *see also al-Kidd*, 563 U.S. at 742 (explaining that clearly established law should not be defined "at a high level of generality"). To that end, Colson must identify a fact pattern from a prior case "similar enough to have given fair and clear warning to officers about what the law requires" so that "a reasonable official would understand that what he is doing violates the rule." *Beck v. Hamblen County*, 969 F.3d 592, 599 (6th Cir. 2020) (internal quotation marks and citations omitted). "This demanding standard protects 'all but the plainly incompetent or those who knowingly violate the law.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (citation omitted).

In denying summary judgment, the district court determined that "a reasonable jury could find that Officer England knew of Colson's [serious and obvious medical need] and disregarded it despite having reasons to believe that the nurse rendered an unreliable medical opinion, if no medical opinion at all."  R. 202, PageID#3360; *see also* R. 105, PageID#1497 ("[W]hether the nurse even rendered any type of medical opinion to begin with—much less one that should invite deference—is dubious.").  Any notion that Russell offered "no medical opinion at all," however, is "blatantly contradicted" by the body camera video footage of Russell's examination.  *See Scott*, 550 U.S. at 380.  Video footage plainly shows that Russell had Colson move her legs to assess her range of motion, that Russell bent down to examine each of Colson's knees for swelling, and that Russell did not discern any unusual swelling, which prompted Russell to believe that no further medical treatment was necessary.  And even if a genuine issue exists as to whether this examination was inadequate, the fact remains that Russell conducted an examination for nearly 60 seconds and, at its close, offered her medical assessment, albeit somewhat inartfully.  On this record, the clearly established inquiry must account for the medical component underlying England's qualified immunity defense.

In other words, the district court had a duty to address England's qualified immunity defense with respect to the particularized facts of the case—chief among them, that a medical examination took place—when evaluating the clearly established prong of the qualified immunity test.  And once this case is framed in the proper factual setting, England is entitled to qualified immunity.  A reasonable officer in England's position would not have understood the Fourteenth Amendment to require her to override Russell's assessment—condensed as it may have been—of Colson's knee injury.  Indeed, neither the majority opinion nor the district court points to any case that addresses with particularity the central factual premise of this one:  an officer's deference to

a medical professional's evaluation. *Beck*, 969 F.3d at 599 ("The plaintiff has identified a rule at too high a level of generality 'if the unlawfulness of the officer's conduct does not follow immediately from the conclusion that [the identified rule] was firmly established.'" (alteration in original) (quoting *Wesby*, 138 S. Ct. at 590)). None of the pre-2015 cases the district court surveyed address a scenario where an officer consulted medical personnel with respect to a detainee's medical condition. Rather, they were all cases in which officers *failed* to consult a medical professional in a timely manner. *See* R. 202, PageID#3361 (citing *Estate of Owensby v. City of Cincinnati*, 414 F.3d 596 (6th Cir. 2005) (denying qualified immunity when officers failed to immediately call an ambulance for a nonbreathing detainee); *Estate of Carter v. City of Detroit*, 408 F.3d 305 (6th Cir. 2005) (denying qualified immunity when officers failed to seek medical attention for a patient experiencing symptoms of cardiac arrest); and *Heflin v. Stewart County*, 958 F.2d 709 (6th Cir. 1992) (denying qualified immunity when officers failed to immediately call an ambulance for a patient found hanging in a shower)). At most, these cases establish an officer's obligation to contact medical professionals promptly when a detainee exhibits obvious symptoms of distress. Colson's jailers did so.

True, as both my colleagues and the district court have noted, we previously stated in *Estate of Carter v. City of Detroit* that a "detainee's right to medical treatment has been established since at least 1987." 408 F.3d at 313. But *Carter*'s formulation of the right in question is akin to a broad legal principle like "an unreasonable search and seizure violates the Fourth Amendment," something the Supreme Court has repeatedly said is "of little help in determining whether the violative nature of particular conduct is clearly established." *See al-Kidd*, 563 U.S at 741 (citation omitted); *see also City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 613 (2015). Nor am I alone in this view—we previously reversed a district court for relying on *Carter* to establish the

"right to medical care" at a high level of generality, emphasizing that clearly established law "must be more particularized than that":

> Yes, a pretrial detainee's right to medical treatment for a serious medical need has been established since at least 1987. And yes, that right encompasses physiological and psychiatric ailments. But these principles do not suffice on their own. Clearly established law may not be defined at such a high level of generality. It must be more particularized than that. The Supreme Court recently reminded us that a plaintiff must identify a case with a similar fact pattern that would have given fair and clear warning to officers about what the law requires. . . . [The plaintiff] has not pointed to, and we have not found, any case like this one . . . .

*Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 992–93 (6th Cir. 2017) (internal citations and quotations omitted). Proving the point, the facts at hand in *Carter* did not involve a medical professional, let alone a scenario where a non-medically trained officer relied on a medical professional's evaluation. 408 F.3d at 305. For these reasons, I would not accept the district court's broadly described contours of the constitutional right at play here. Nor would I suggest, as the majority opinion does, that England bears the burden to *disprove* the generalized contours of a broadly defined right to detainee medical care. Maj. Op. at 16 ("Each case England cites . . . is distinguishable."). That puts the inquiry in reverse. After all, Colson, not England, bears the burden of proving the clearly established law specific to the contours of this case. *See Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 681 (6th Cir. 2013).

Nor, for that matter, may we dispense with the duty to identify a factually similar case. Time and again, the Supreme Court has required us to point to factually specific case law establishing the right in question. *See, e.g.*, *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (per curiam); *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam); *Wesby*, 138 S. Ct. at 593; *Pauly*, 137 S. Ct. at 551; *Mullenix v. Luna*, 577 U.S. 7, 11–12 (2015) (per curiam). Sure enough, the Supreme Court has, on occasion, done otherwise in unique instances in which a constitutional violation is self-evident from the particularly egregious conduct of government

officials. *Taylor v. Riojas*, 141 S. Ct. 52, 53–54 (2020) (per curiam); *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). But Colson's case does not fall into that *sui generis* category of cases embodied by *Hope v. Pelzer*, and, more recently, *Taylor v. Riojas*. Consider the dramatic sequence of events in *Hope*. Prison guards shackled an inmate in a stress position to an outdoor hitching post for seven hours, shirtless in the baking sun, while taunting him and depriving him of water and bathroom breaks. *Id.* at 733–35. This "obvious cruelty," the Supreme Court rightly acknowledged, was "antithetical to human dignity" and "should have provided [the guards] with some notice that their alleged conduct violated Hope's constitutional protection against cruel and unusual punishment." *Id.* at 745. The same goes for *Taylor*, where the "particularly egregious" facts of confining an inmate in a frigid, feces-covered cell for six days should have put "any reasonable officer" on notice that such "conditions of confinement offended the Constitution." *Taylor*, 141 S. Ct. at 54. But those shocking circumstances are worlds apart from this case.

In short, nothing in our pre-2015 case law instructed England to disregard a medical professional's assessment. That is true even in view of the district court's factual findings—that Russell was not present when Colson fell and had trouble standing, that Russell examined Colson's knee for just about a minute, and that Russell's only statement to England after her brief examination was that she did not see swelling, at which point Russell walked away. The same goes for the inference drawn by the district court that Russell's medical opinion was "unreliable." R. 202, PageID#3360. (I assume as given for today's purposes that such a statement truly constitutes an unreviewable factual inference and not a reviewable legal conclusion, although that distinction here, as elsewhere, is hardly clear. *See Romo v. Largen*, 723 F.3d 670, 685 (6th Cir. 2013) (Sutton, J., concurring in part and concurring in the judgment).)

Confirming the point, since Colson's arrest, we have held that a non-medically trained officer can "reasonably defer[]" to a medical professional's opinion, so long as she "had no reason to know or believe that [the] recommendation was inappropriate." *McGaw v. Sevier County*, 715 F. App'x 495, 498 (6th Cir. 2017) (citations omitted); *see also id.* at 498–99 ("Where, as here, an officer responds to a substantial risk of serious harm by asking for and following the advice of a professional the officer believes to be capable of assessing and addressing that risk, then the officer commits no act of deliberate indifference in adhering to that advice."). As the majority opinion implies, that rule might prove problematic to England's qualified immunity defense if the events underlying this case happened today. But looking back, as we must, this development only further demonstrates that the district court's broadly defined constitutional violation was both inadequately particularized and not clearly established as of 2015. *See Reichle v. Howards*, 566 U.S. 658, 669 (2012). When these standards are properly defined, Colson cannot overcome England's qualified immunity.